Joseph Eugene, house of Nagy, sui juris
Private Attorney General
Non-Domestic Mail
c/o 508 Pennsylvania Avenue
Phillipsburg, New Jersey
ZIP Exempt
Relator In Propria Persona
All Rights Reserved Without Prejudice

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Joseph Eugene, house of Nagy,<br>as Private Attorney General<br><br>Plaintiff,<br><br>v.<br><br>AETNA, INC.; KENNEDY PC;<br>HCR MANORCARE; NORTHAMPTON<br>COUNTY;  ABC CORPORATIONS (1-5);<br>and JOHN DOES (1-5), fictitious names,<br><br>Defendants.<br>_____<br><br>United States,<br>    Interventor,<br><br>ex rel.<br>Joseph Eugene,<br>house of Nagy<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **COMPLAINT**<br>and<br>JURY DEMAND |

**COMES NOW** Joseph Eugene, house of Nagy, ex relatione, sui juris, a man of God, a living soul, holder of the office of "the people", Inhabitant of the land of New Jersey with full responsibility for My actions under God's law as found in the Bible, and no other, as Private Attorney General (hereinafter "Relator"):

Complaint and Jury Demand

**United States as Intervenor**

Relator petitions the Court for the United States to join the cause and serve the public's best interest.

**Private Attorney General**

The U.S. Congress codified the 'private attorney general' principle into law with the enactment of Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988. The Senate Report on this statute stated that The Senate Committee on the Judiciary wanted to level the playing field so that private citizens, who might have little or no money, could still serve as "private attorneys general" and afford to bring actions, even against state or local bodies, to enforce the civil rights laws.

**Attorney General, Private**

The "private attorney general" concept holds that a successful private party plaintiff is entitled to recovery of his legal expenses, including attorney fees, if he has advanced the policy inherent in public interest legislation on behalf of a significant class of persons. Dasher v. Housing Authority of City of Atlanta, Ga., D.C.Ga., 64 F.R.D. 720, 722. See also Equal Access to Justice Act. [Black's Law Dictionary]

Relator alleges those charged intentionally, or knowingly, or recklessly, or willfully, or with criminal negligence did engage in monetary transactions in property derived from specified unlawful racketeering activity. Many civil rights statutes rely on private attorneys general for their enforcement. In Newman v. Piggie Park Enterprises, one of the earliest cases construing the Civil Rights Act of 1964, the United States Supreme Court ruled that "A public accommodations suit is thus private in form only. When a plaintiff brings an action . . . he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority."

## I.   PARTIES

**One.** Relator is an adult United States National who has a postal address c/o 508 Pennsylvania Avenue, Town of Phillipsburg, Warren County, New Jersey.

**Two.** Defendant Aetna, Inc. is a managed health care provider with its corporate headquarters in Connecticut State.

**Three.** Defendant HCR Manor Care is a professional health care provider doing business in Pennsylvania with its corporate headquarters in Ohio State.

**Four.** Defendant Kennedy PC is a law firm doing business in Pennsylvania State.

**Five.** Defendant Northampton County is a home rule charter corporation doing business in Pennsylvania State.

## II.   JURISDICTION & VENUE

**Six.** Jurisdiction of the Court is conferred by 28 U.S.C. § 1332(a) by virtue of the parties' diversity of citizenship with most of the events occurring in Pennsylvania State.

**Seven.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).

## III.  AMOUNT IN CONTROVERSY

**Eight.** The amount in controversy exceeds the sum or value of Seventy-Five-Thousand-Dollars ($75,000.00) exclusive of interest and costs.

## IV.  INTRODUCTION

There are a significant amount of billing and legal abuses concerning the health care industry in the USA. The victims and their families suffer tremendously. The countless regulatory agencies investigate and then leave them to fend for themselves. This action documents the personal injuries, abuses, gross negligence, and alleged crimes Joseph A. Nagy, Katherine Nagy, husband and wife, and their son, Joseph Eugene, house of Nagy, Relator, AKA Joseph E. Nagy, and family experienced with Defendants' Aetna, HCR Manor Care, Kennedy PC, and Northampton County and non-Defendants' St. Luke's Warren Hospital, Signature Healthcare, and Genesis Healthcare. It focuses on the gross negligence and billing fraud perpetrated by the nursing homes and the alleged criminal acts they committed to collect

Complaint and Jury Demand                                      P a g e | 3

money from the family while the insurance carrier uses bogus criteria to circumvent the obvious Convalescent Facilities coverage. The nursing homes use coercive tactics ranging from threatening the patient being discharged to the home to the degraded filing in Orphan's Court.

# V.  COMPLAINT

Relator pursues in behalf of RICO and Racketeering Activities Chapter 95 § 1957, and Chapter 96 §§ 1961, 1962, and 1964; and the Clayton Act:

> Both statutes [RICO and Clayton Act] bring to bear the pressure of "private attorneys general" on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages. [Agency Holding Corp. v. Malley-Duff & Associates] [107 S.Ct. 2759, 483 U.S. 143, 151 (1987)]

Pursuant to FRCrP Rule 3: **The Complaint**. The Complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a magistrate.

Pursuant to 18 U.S.C. Section 3041: **Power of courts and magistrates.** For any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate judge, or by any chancellor, judge of a supreme or superior court, chief or first judge of the common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested and imprisoned or released as provided in chapter 207 of this title, as the case may be, for trial before such court of the United States as by law has cognizance of the offense.  Copies of the process shall be returned as speedily as may be into the office of the clerk of such court, together with the recognizances of the witnesses for their appearances to testify in the case. A United States judge or magistrate judge shall proceed under this section according to rules promulgated by the Supreme Court of the United States. Any state judge or magistrate acting hereunder may proceed according to the usual mode of procedure of his state but his acts and orders shall have no effect beyond determining, pursuant to the provisions of section 3142 of this title, whether to detain or conditionally release the prisoner prior to trial or to discharge him from arrest.

And pursuant to alleged Federal Crimes 18 U.S.C. Sections 241, 1001, 1343, and 1957 (RICO), legal malpractice; misusing the legal system; third party beneficiary contract claims against attorneys; civil rights; property rights; reports and serves this, Relator's

**COMPLAINT** and JURY DEMAND, against the following named and unnamed individuals.

**Relator** hereby formally charges:

Aetna, Inc.;

HCR ManorCare;

Kennedy, PC;

Northampton County;

agents for Aetna, Inc., HCR ManorCare, Kennedy PC, and Northampton County; ABC Corporations, (1-5), John Does, (1-5); with:

## COUNT I - 18 U.S.C. Section 1957 - Racketeering
Engaging in monetary transactions in property derived from
specified unlawful activity

Commission of multiple felonies engaging in monetary transactions in property derived from specified unlawful activity U.S.C. Section 1957(a);

> (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

## COUNT II - 18 U.S.C. Section 1962 - RICO
Prohibited Activities

Commission of multiple felonies RICO Prohibited Activities 18 U.S.C. Section 1962;

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or

participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

## COUNT III - 18 U.S.C. Section 241
## Conspiracy against Rights

Commission of multiple felonies conspiracy against Rights 18 U.S.C. Section 241;

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise enjoyment of any right or privilege so secured –

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

## COUNT IV - Legal Malpractice

Commission of multiple felonies breach of fiduciary duty, breach of contract, misusing the legal system, and third party beneficiary contract claims;

Attorneys have a fiduciary relationship with their clients and owe them fiduciary duties. These cannot be taken lightly or dispensed with, even for the economy of class actions. Huber v. Taylor, 469 F.3d 67, 82 (3rd Cir. 2006) (applying Texas law). As eloquently stated by Judge Cardozo in In the Matter of Rouss, "[m]embership in the bar is a privilege burdened with conditions." Huber, 469 F.3d at 82, citing, Rouss, 116 N.E. 782 (1917). "Pennsylvania law "imposes on attorneys the status of fiduciaries vis a vis their clients; that is, attorneys are

bound, at law, to perform their fiduciary duties properly."" Fiorentino v. Rapoport, 693 A.2d 208 (Pa.Super.1997) at 213 (breach of fiduciary duty elements not detailed), citing, Maritrans v. Pepper, Hamilton & Scheetz, 602 A.2d 1277 (1992) at 1283. Pennsylvania Courts recognizes claims against attorneys for breach of fiduciary duties. See, Maritrans v. Pepper, Hamilton & Scheetz, 602 A.2d 1277 (1992) at 1283 (breach of fiduciary claim arising from a conflict of interest).

# COUNT V - 28 U.S.C. § 1343
## Civil Rights and elective franchise
Commission of multiple felonies Civil rights and elective franchise;

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote. …

# COUNT VI - 18 U.S.C. § 1962
## Prohibited activities (RICO)
Commission of multiple felonies Prohibited activities (RICO);

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

KNagy is the beneficiary. On June 29, 2012, Relator was granted Durable POA which includes health care and legal directives. MCare is the fiduciary. MCare acquired Kennedy PC to petition for guardianship in Ophan's Court. Guardianship for what? Guardianship to make health care, property and/or legal decisions? And the fiduciary files against the beneficiary who has Convalescent Facility's coverage and a POA with the above and lets Aetna's coverage criteria fraud rule, right? And arbitration is only for funds owed, right? Relator's ears are ringing due to double talk. Or, is it possible they can racketeer in a more roundabout fashion? Relator would provide some soap, but, believes the Defendants no longer wash their hands.

    "Racketeering activity" for purposes of the RICO Act means any act "chargeable" under several generically described state criminal laws, any act "indictable" under numerous specific federal criminal provisions, including mail and wire fraud, and any "offense" involving bankruptcy or securities fraud or drug-related activities that is "punishable" under federal law.  The RICO Act prohibits the use of income derived from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; the acquisition or maintenance of any interest in an enterprise "through" a pattern of racketeering activity; conducting or participating in the conduct of an enterprise through a pattern of racketeering activity; and conspiring to violate any of these provisions.

    The gravamen of the offense under RICO Act is the illegal derivation of the funds.  The offenses considered as racketeering activity include bribery, counterfeiting, embezzlement from pension and welfare funds, fraud relating to identification documents and access devices, extortionate credit transactions, transmission of gambling information, mail fraud, wire fraud, witness tampering, retaliation against witness, obstruction of state or local law enforcement, interference with commerce, bribery, or extortion, interstate transportation in aid of racketeering, unlawful welfare fund payments, money laundering, monetary transactions in property derived from unlawful activities, sexual exploitation of children, interstate transportation of stolen property, sale of stolen goods, embezzlement from union funds, etc.  In addition, bankruptcy fraud, fraud in the sale of securities, felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or

other dangerous drugs, and any act indictable under the Currency and Foreign Transactions Reporting Act are considered to be racketeering activity. Also, violations of state law which constitute "racketeering activity" under the federal RICO Act must be punishable by imprisonment for more than one year. The offenses falling under this category include murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, and dealing in narcotic or other dangerous drugs. Courts have held that the list of state law crimes that can constitute "racketeering activity" under RICO is exclusive.

A fundamental breach of a contract, sometimes known as a reputatory breach, is a breach so fundamental that it permits the distressed party to terminate performance of the contract, in addition to entitling that party to sue for damages.

**Relator** hereby formally charges:

HCR ManorCare;

Kennedy, PC;

Northampton County;

agents for HCR ManorCare, Kennedy PC, and Northampton County; ABC

Corporations, (1-5), John Does, (1-5); with:

## COUNT VII - Misusing the Legal System
### Abuse of Process Claims Against Attorneys

"The tort of 'abuse of process' is defined as the use of legal process against another 'primarily to accomplish a purpose for which it is not designed.' " *Shiner*, supra, 706 A.2d at 1236, *citing, Rosen v. American Bank of Rolla*, 627 A.2d 190, 192 (1993) (quoting RESTATEMENT (SECOND) OF TORTS § 682). The elements of an abuse of process claim are:

    (1) use of a legal process,
    (2) primarily to accomplish a purpose for which the process was not designed; and
    (3) causing harm. Shiner, 706 A.2d at 1236, citing, Rosen, supra, 627 A.2d at 192.

In some circumstances, the filing of any petition or legal document is sufficient to satisfy the element of "use of a legal process." *Shiner*, 706 A.2d at 1237, citing, *McGee v. Feege*, 535 A.2d 1020 (1987) ("rejecting precedent indicating that seizure of person or property by legal process is required for a claim of abuse of process"). In *Shiner*, the Superior Court stated that any of the petitions or motions filed in the underlying claim could constitute the use of process required for the tort of abuse of process. *Shiner*, 706 A.2d at 1237.

However, legal process arising from the use of bankruptcy proceedings cannot be used to support a state claim of wrongful use of civil proceedings because the Federal Bankruptcy Code provides an extensive scheme with its own remedies and sanctions for misuse of its own sanctions for abuse of its system and thereby preempts the state proceedings. *Shiner*, 706 A.2d at 1238.

Relator believes the guardianship petition is a racketeering front to access KNagy's meager funds.

## COUNT VIII - Third Party Beneficiary Contract Claims Against Attorneys

In some instances, non-clients may bring actions against attorneys as third party beneficiaries to a contract between an attorney and client when the attorney's negligence or breach has caused harm to the non-client, third party. A prime example is when legatees under a will claim that they were denied their intended benefits of a will because of an attorney's mistake. "[O]ur Supreme Court has made available to legatees a cause of action as intended third-party beneficiaries of the contract between the testator and his or her attorney for the drafting of the will involved, pursuant to the principles of the Restatement (Second) of Contracts § 302 (1979)." Hess, supra, 925 A.2d at 806.

KNagy is the third party beneficiary to the Relator duress contract.

## COUNT IX - Action for neglect to prevent conspiracy; Property rights of citizens; Conspiracy to interfere with civil rights

## VI. BACKGROUND

**Nine.** Joseph A. Nagy is Katherine Nagy's husband and is an adult United States National whose postal address is c/o 508 Pennsylvania Avenue, Town of Phillipsburg, Warren County, New Jersey ZIP Exempt.

**Ten.** Katherine Nagy is the wife of Joseph A. Nagy and is an adult United States National whose postal address is 2600 Northampton Street, Easton, Northampton County, Pennsylvania ZIP Exempt and was at home with her husband until she was admitted to Warren Hospital on March 21, 2011.

**Eleven.** On or about June 29, 2012, Joseph A. Nagy and Katherine Nagy, being of sound mind and disposition, gave Relator, their son, Durable Powers' of Attorney effective that date to manage all of their legal and financial affairs.

## VII.  FACTUAL ALLEGATIONS

Relator by way of this Complaint alleges:

**Twelve.** On or about March 17, 2011, Katherine Nagy ("KNagy") began having urinary problems and her speech became slurred. She walked with her cane or walker.

**Thirteen.** On or about March 20, 2011, KNagy went to the Sands Casino.

**Fourteen.** On or about March 21, 2011, KNagy's husband, Joseph A. Nagy ("JANagy"), called Dr. Cumbo's office and was told to take her to Warren Hospital. She was admitted that day.
Warren Hospital is now a St. Luke's University Hospital.

**Fifteen.** On or about March 22, 2011, consultation documentation states KNagy "was seen today in neurological consultation at the request of Dr. Dalsaniya for transient ischemic attack/cerebrovascular accident." The consulting physician was Dr. Todd Garber and the attending physician was Dr. Keyurkumar Dalsaniya. A plan was presented for acute stroke in the right corona area. The other consultation documentation was for "Urinary incontinence" requested by Dr. Keyurkumar Dalsania. Presently KNagy had "an increase of her frequency and urgency or urination for the previous 2-3 weeks but denies and abdominal pain, discomfort, or hematuria." A plan was presented for a bladder scan. The consulting physician was Dr. Margolis and the attending physician was Dr. Dalsaniya. KNagy showed dramatic improvement positively responding to the treatment.

**Sixteen.** On or about March 23, 2011, Warren Hospital called JANagy and said KNagy would be discharged today. JANagy arrived about one o'clock and he was told they were doing one more test and then he could take KNagy

home. JANagy went to the cafeteria and then returned to KNagy's room and she wasn't there. The staff told him KNagy was in ICU.

There is no dated consultation documentation for this. There is an undated document that shows the requesting physician as "Hospital Service". The suspect document shows the consulting physician as Dr. Stephen Ksiazek and the attending physician as Dr. Dalsaniya.
The Review of System's field shows "Unobtainable". The Physical Examination field is blank. The Vital Signs states, "The patient's blood pressure over the past 24 hours has ranged from approximately 168-215/108". The General field states, "There are audible moist secretions and/or gurgling sounds heard. The patient, at times, gestured, but was not able to communicate effectively". The Head, Eyes, Ears, Nose, Throat field states, "Unremarkable. She has an NG tube in place". A plan was presented for hypertension, hyperlipidemia, and CVA to continue Plavix per Neurology". Dr. Thomas Little, KNagy's cardiologist, wasn't informed of Plaintiff's admission until after she was admitted to ICU.

KNagy was discharged to Brakeley Park Center on April 5, 2011.

The Warren Hospital W8A dated April 13, 2011 has no charges for the March 23, 2011 Description of Hospital Service's Culture, Surveil Service Code 4066184's that occurred just prior to KNagy's admittance to ICU. The Total Charges and Est. Coverage Ins. Co. No. 1 fields are blank. The previous entered charge is for Autom Urinalysis Service Code 4065000 with a charge of 123.00. The following entered charge is for Room 0004(ICU) Service Code 1370000 with a charge of 3195.00. There are no references made to the medical procedure being performed, the agents involved, it's start time, status, or KNagy's, vital signs, location or disposition at the time of the documented "stroke".

The next entry is for Venipuncture on March 24, 2011.

**Seventeen**. On or about March 25, 2011, the consultation documentation states KNagy had, "slurred speech and urinary incontinence, and was noted to have left facial droop as well, and was subsequently found to have acute right cerebrovascular accident by MRI" requested by Dr. Dalsaniya. The consulting physician for the "Hypertension management and cardiac assessment" was Dr. Popkave and the attending physician was Dr. Dalsaniya.

**Eighteen.** On or about March 27, 2011, the consultation documentation states, "Dr. Kaza was called for consult on this patient in ICU at Warren Hospital" and then he was covered by Dr. Mittal. It further states, "The patient is awake unable to communicate much because of the stroke". The consulting physician for the "Occult blood positive" was Dr. Mittal and the attending physician was Dr. Dalsaniya.

**Nineteen.** On or about April 4, 2011, KNagy had surgery for the PEG tube. The tube feedings would start tomorrow and she was then admitted to Brakely Park Center ("BPCenter"), a Genesis HealthCare company, in Phillipsburg, New Jersey.

**Twenty.** KNagy has been admitted to Warren and Easton Hospital's numerous times over the last two years for pneumonia, etc., and was wrongfully rejected re-admission to BPCenter in Phillipsburg, New Jersey, and New Eastwood Care and Rehabitation in Easton, Pennsylvania ("New Eastwood"), a Signature HealthCare company, due to non-payment. KNagy has Convalescent Facility Coverage with Aetna, Inc.("Aetna"). KNagy's family is currently dealing with the same billing issues with HCR ManorCare. KNagy hasn't been home since the Warren Hospital admission in March.

**Twenty-One.** On or about July 8, 2011, Relator met with Shirley Billiard of BPCenter and told her Aetna stated mom is covered. Shirley said she worked with IR employees a long time and "no one has nursing home" coverage. She said, "we'll get our money" and presented a bill for $9780. Shirley Billiard with BPCenter sent Relator the SNF determination on continued stay and the MC benefit has been used up.

**Twenty-Two.** On or about July 10, 2011, Relator obtained KNagy's Warren Hospital records. Upon examination he became aware of the missing aforementioned fields and vague documentation for the March 23, 2011 incident.

**Twenty-Three.** On or about July 18, 2011, Nicole with Aetna told Relator his mom had unlimited convalescent coverage with 1 day prior hospital stay.

**Twenty-Four.** On or about July 25, 2011, the therapist at BPCenter was making KNagy walk in spite of her injuries and Relator said she needed to lighten up on her because she was in pain. Relator called 911 and reported abuse. Relator filed a complaint with Quality of Care against BPCenter on July

26 for the three nursing home injuries she received, one one her left shoulder, one on her right foot and one on her right leg.

**Twenty-Five.** On or about July 29, 2011, Shirley Billiard presented Cher Nagy a private pay bill for $14,408.09.

**Twenty-Six.** On or about August 12, 2011, BPCenter sent a "notification of the intent to discharge Katherine Nagy to her home at 508 Pennsylvania Avenue, Phillipsburg, NJ on Monday September 12, 2011" for "failure to pay". This was appealed with Ombudsman.

**Twenty-Seven.** On or about August 19, 2011, JANagy sent BPCenter a letter that he was authorized to receive the funds per KNagy's July 10, 2011 correspondence.

**Twenty-Eight.** On or about September 2, 2011, Abbey and Sharon of BPCenter held KNagy's discharge meeting with JANagy, Relator and Cher Nagy. We were vindictively told Aetna is not covering the bill. Relator told them Aetna stated mom was covered and I told her we were given 4 different bills and Abbey said, "pay them all".

**Twenty-Nine.** On or about September 9, 2011, BPCenter  sent a JANagy a "notification that discharge planning for your wife, Katherine Nagy, is no longer necessary". Aetna contacted them and stated she is covered "for services in a skilled nursing home beyond 100 days".

**Thirty.** On or about September 15, 2011, BPCenter sent KNagy an adjusted bill for $28.30.

**Thirty-One.** On or about September 29, 2011, JANagy sent Warren Hospital a letter that he was considering filing criminal charges against them. Tom Michaels from the hospital had stated they would put a lien on my property.

**Thirty-Two.** On or about October 5, 2011, Dan with Aetna told Relator his mom had unlimited days nursing home care coverage.

**Thirty-Three.** On or about January 31, 2012, KNagy had medical complications in the lobby of Dr. Waldon's office while she and Relator waited 1 hour and 15 minutes for the ambulance to return her to New Eastwood. Dr. Waldon called the service from the lobby at 05:05 P.M. KNagy was stranded

without her medical supplies and the Manor Care aide gave her water under duress while waiting.

**Thirty-Four.** On or about February 1, 2012, KNagy was admitted to Easton Hospital ICU #9 for 6 days after her condition from yesterday worsened. She was in very critical condition due to fluid in her lungs.

**Thirty-Five.** On or about February 15, 2012, KNagy was discharged from Easton Hospital and re-admitted to New Eastwood.

**Thirty-Six.** On or about February 27, 2012, New Eastwood wrongly admitted KNagy to Warren Hospital.

**Thirty-Seven.** On or about March 6, 2012, KNagy was discharged from Warren Hospital and re-admitted to New Eastwood.

**Thirty-Eight.** On or about March 21, 2012, KNagy was admitted to Easton Hospital.

**Thirty-Nine.** On or about April 2, 2012, KNagy was discharged from EastonHospital and New Eastwood refused readmission due to non-payment. The Easton Hospital Case Manager Teresa Muscanara confirmed KNagy has convalescent care coverage.

**Forty.** On or about April 11, 2012, Michell with Aetna told Relator a new pre-certification was not required because they still had that from August 19, 2011 for ManorCare ("MCare"). They hadn't received records from New Eastwood to process any claims.

**Forty-One.** On or about April 17, 2012, KNagy was admitted to Manor Care ("MCare") in Easton, Pennsylvania, with pre-certified Aetna coverage Auth # PME52041517 and Relator signed for KNagy with that understanding.

**Forty-Two.** On or about April, 20, 2012, Chris Butz from New Eastwood sent "Joseph Nagy" a bill for $28,667.99 for the dates of December 2011 - March 2012. JANagy sent New Eastwood a Notice of Arbitration with a demand for $150,000.00 for the wrongful admission to Warren Hospital.

**Forty-Three.** On or about May 16, 2012, Relator requested the Ingersoll-Rand benefit's summary from Aetna.

**Forty-Four.** On or about May 23, 2012, Relator received the benefit's summary from Aetna, Aetna Plan 824 (KQ). KNagy and JANagy both have $500,000.00 coverage that includes convalescent facilities. This was soon forwarded to MCare. During two phone inquiries, Relator was told KNagy had "unlimited" nursing home care coverage.

**Forty-Five.** On or about July 10, 2012, Aetna sent a letter to KNagy stating the coverage decision for the period 07/03/2012-07/03/2012 for 1 Day(s) Skilled Nursing has been denied. Aetna stated there is another medical benefit plan and the expenses should be submitted to the other plan and then submitted to the benefit payment office showing the amount the other plan paid for each expense.

**Forty-Six.** On or about July 31, 2012, Shernette with Aetna told Relator his mom had unlimited nursing home coverage and there was "no cap".

**Forty-Seven.** As of this date, KNagy remains at MCare. She is still miraculously responsive and generally confined to bed unable to walk since the BPCenter injuries. Her rehab was compromised by the continuous documented accidents or negligent care that required multiple hospital admissions causing pain and suffering, and emotional distress. At BPCenter in Phillipsburg, New Jersey and New Eastwood in Easton Pennsylvania, there were numerous healthcare violations recorded. These facilities have all negligently or intentionally caused intentional emotional distress due to Aetna's claim denial even with a Lifetime Comprehensive Medical Coverage Maximum of $500,000.00 each that includes convalescent facility coverage. Now Aetna states KNagy doesn't require skilled nursing care and should be at home or in another facility. Relator verified with Aetna KNagy's payout has been $44,000 and the balance for the plan was $455,000.

**Forty-Eight.** On or about September 19, 2012, KNagy was admitted to Easton Hospital.

**Forty-Nine.** On or about September 29, 2012, KNagy was re-admitted to MCare.

**Fifty.** On or about October 04, 2012, Aetna sent a letter to KNagy stating the coverage decision for the period 09/27/2012 - 10/04/12012 for 8 Day(s) Skilled Nursing has been denied.

**Fifty-One.** On or about October 13, 2012, JANagy sent Aetna an appeal for the above coverage denial.

**Fifty-Two.** On or about October 22, 2012, Relator received a voice-mail from Edward Schuch, the MCare administrator, stating there was a billing issue and Relator was putting KNagy's welfare in jeopardy due to non-payment. Thus began the breach of contract and trust.

**Fifty-Three.** On or about October 23, 2012, MCare wrongly sent another letter to Joseph Nagy, Jr. JANagy responded with a Notice of Arbitration and stated his son, Relator, who is not a Jr., "refuses to co-operate with anyone in any criminal activities". His Notice for Arbitration has been ignored as well as the request for information and answers to JANagy's Administrative Interrogatories.

**Fifty-Four.** On or about November 5, 2012, a letter addressed to Joseph Nagy, Jr. with important billing information enclosed was received at the Nagy home and refused.

**Fifty-Five.** On or about March 26, 2013, Mr. Nagy was sent a Certified Mail Delivery Notice the from Kennedy Law. Relator sent a Notice of Arbitration to Mr. Schuch of Manor Care alleging conspiracy etc. and sent a Notice to Mr. Disidore of Northampton County alleging racketeering and they both included Administrative Interrogatories.

**Fifty-Six.** On or about March 27, 2013, KNagy presented a letter to Mr. Schuch of MCare charging $1,000.00 per day for the court action and informed she wanted to attend any hearing.

**Fifty-Seven.** On or about March 28, 2013, Relator was sent a large envelope from Rodney Myer, Esquire with Kennedy, PC, located in Cedars, Pennsylvania.

**Fifty-Eight.** On or about March 30, 2013, MCare again wrongly sent Joseph Nagy, Jr. another important bill for Relator.

**Fifty-Nine.** On or about April 1, 2013, Relator called Rodney Myer of Kennedy PC and identified himself as Joseph Eugene, house of Nagy. That is my Christian name and I had their unopened letter. He was informed the court does not have jurisdiction over a man, a sovereign living soul. He verified they were proceeding in Orphan Court and said the arbitration agreement had

nothing to do with guardianship. Relator disagrees. He told me I needed mental help even though he did not know anything about a private attorney general filing racketeering suits before hanging up on me.

**Sixty.** As a direct and proximate result of the above-described occurrences, Relator and family have incurred substantial medical expenses to date, all of which have been to their great financial loss.

**Sixty-One.** As a direct and proximate result of the above-described occurrences, Relator and family will have to expend large sums of money into the future due to the nature of her injuries sustained in this incident, all of which will have been to her great financial loss.

**Sixty-Two.** At all times relevant herein, Defendants acted individually, collectively, and/or by and through its agents, servants, workers and/or employees, who are more particularly described herein, and who acted within the course of and scope of their employment and in furtherance of their and the Defendants' business and professional interests.

**Sixty-Three.** At all times relevant herein, Relator and family looked to Defendants individually, collectively, and/or by and through its agents, servants, workers and/or employees, for medical coverage diagnosis, medical treatment and medical care relating to the injuries, ailments and maladies suffered by KNagy which are more particularly described herein and who acted within the course of and scope of their employment and in furtherance of their and the Defendants' business and professional interests.

**Sixty-Four.** At all times relevant herein, Defendants individually, collectively, and/or by and through its agents, servants, workers and/or employees, had a duty to exercise the degree of professional skill and knowledge ordinarily possessed and exercised by administrative and legal professionals within their respective disciplines of health care and law.

**Sixty-Five.** Defendants and their agents, servants, workers, and/or employees are health care professionals or law professionals and this action is a medical professional liability and legal malpractice action. Accordingly, the information and documentation obtained is a basis to conclude that the care, skill or knowledge exercised or exhibited by these Defendants and its agents, servants, workers, and/or employees herein, in the treatment, practice or work that such conduct was a cause in bringing about the harm to KNagy, Relator and family; and the claim that Defendant and its agents, servants,

workers and/or employees, deviated from an acceptable professional standard that is based solely on the fraudulent documentation that suspiciously supports the occurrence of nursing home care coverage.

**Sixty-Six.** Defendants and its agents, servants, workers, and/or employees herein deviated from accepted standards within their areas of medical health care, billing and law that is more particularly described in this Complaint.

**Sixty-Seven.** KNagy, Relator and the family suffered injuries as a direct result of Defendants and its agents, servants, workers and/or employees' conduct, acts and/or omissions herein either individually and/or jointly.

**Sixty-Eight.** As a direct and proximate result of the above-described occurrences, KNagy, Relator and family has suffered great mental anguish and physical pain up to the date of the filing of this Complaint, all of which have been to their great financial loss.

**Sixty-Nine.** As a direct and proximate result of the above-described occurrences, KNagy, Relator and family will continue to suffer great mental anguish and physical pain into the future, all of which will have been to their great financial loss.

**Seventy.** As a direct and proximate result of the above-described occurrences, KNagy has been unable to pursue her customary social, recreational, vocational and domestic activities in the same manner for extended periods of time into the future, all of which have been to her great financial loss.

**Seventy-One.** As a direct and proximate result of the above-described occurrences, KNagy has been unable to enjoy the usual activities of the life of an individual her age and has suffered a loss of enjoyment of life, loss of life expectancy, loss of happiness and loss of the pleasure of life up to the date of the filing of this Complaint, all of which have been to her great financial loss.

**Seventy-Two.** As a direct and proximate result of the above-described occurrence, KNagy will in the future be unable to enjoy the usual activities of the life of an individual her age and will suffer a loss of enjoyment of life, loss of life expectancy, loss of happiness and loss of the pleasure of life throughout the remainder of her life, all of which will have been to her great financial loss.

## VIII. SUMMARY

Aetna, MCare, Kennedy PC and Northampton County did conspire against Relator,KNagy and their family and willfully, knowingly or with gross negligence charged exceptional amounts of money due to the alleged crippling criminal injury and the ongoing injuries that attributed to her failure to rehabilitate.

Aetna recently stated KNagy doesn't require skilled nursing care and should be at home or in another facility. If that is true, why did Easton Hospital transfer her to MCare and why is the monthly rate in excess of $10,000.00 if she isn't receiving skilled care? Relator verified KNagy's payout was $44,000 and the balance for the plan was $455,000.

MCare solicited the Pennsylvania Department of Heath for Relator to apply for Medicaid for KNagy and that seems useless since Medicare only covers required skilled care and so far MCare has failed to state that in writing to Relator as requested in the Administrative Interrogatories.

KNagy failed to receive aid in respect to her injury weakened body and instead health care officials chose to cover-up or deny they had compromised her generally healthy and stable condition. Officials chose to harass, degrade and send criminally tainted bills attempting to collect an unlawful debt while conveniently overlooking Aetna's criminal actions thus joining as conspirators and racketeers.

## IX.   CLAIMS FOR RELIEF

### COUNT X

### (v. HCR MANORCARE, KENNEDY PC, and NORTHAMPTON COUNTY)

**Seventy-Three.** Relator incorporates by reference the allegations contained in

paragraphs one through seventy-two, inclusive, as though same were set forth

herein at length.

**Seventy-Four.** The aforesaid injuries and damages suffered by KNagy,

Relator and family more fully set forth herein were directly, proximate and

legally substantially caused by the negligence, carelessness, gross

Complaint and Jury Demand

negligence, recklessness, willful and knowing acts and/or failures to acts of Defendants, in that it acted individually, collectively, and/or by through its agents, workers, servants and/or employees, who were working within the course and scope of their employment, *inter alia*, two or more did the following:

    (a)  conspired in the wrongful guardianship petition for KNagy;

    (b)  routinely failed in their fiduciary duties by injuring KNagy;

    (c)  performed racketeering style activities (RICO);

    (d)  conspired to deny civil rights;

    (e)  conspired to violate the arbitration agreement;

    (f)  conspired to coerce and/or extort the payment of unlawful funds from a sovereign family;

    (g)  joined together in the resulting mail fraud and RICO activities;

    (h)  joined together in the fundamental breach of a contract that permits Relator to terminate its performance and sue for damages.

**Seventy-Five.** As a result of the above-described occurrences, KNagy, Relator and family has suffered mental anguish, emotional distress, anxiety, embarrassment and humiliation and will continue to suffer the same for an indefinite period of time in the future, all to their great loss and detriment.

**Seventy-Six.** The aforesaid acts of negligence, carelessness, gross negligence, recklessness, willful and knowing acts and/or failures of acts of Defendants, and/or its agents, workers, servants and/or employees, created a

Complaint and Jury Demand

high degree of risk of harm to KNagy, Relator and family, which harm, in fact, did occur as set forth herein.

## X.   CLAIMS FOR RELIEF

## COUNT XI

### (v. AETNA)

**Seventy-Seven.** Relator incorporates by reference the allegations contained in paragraphs one through seventy-two, inclusive, as though same were set forth herein at length.

**Seventy-Eight.** The aforesaid injuries and damages suffered by KNagy, Relator and family more fully set forth herein were directly, proximate and legally substantially caused by the negligence, carelessness, gross negligence, recklessness, willful and knowing acts and/or failures to act of Defendants, in that it acted individually, collectively, and/or by through its agents, workers, servants and /or employees, who were working within the course and scope of their employment, *inter alia*, did the following:

(a)  routinely breached in paying for KNagy's nursing home expenses;

(b)  rountinely breached in upholding the pre-certified authorization code for KNagy's nursing home expenses;

(c)  misrepresented coverage in MCARE's and Relator's contract;

(d)  fraudulently invented criteria that denied coverage;

(e)  performed racketeering style activities (RICO);

Complaint and Jury Demand

(f)   fraudulently used the U.S. Mail to assist in their scheme;

(h)   executed many fundamental breaches of IR retiree JNagy's contract that permits termination of its performance and suit for damages;

(i)   routinely failed to comply with controlling law in the administration of health care benefits;

As a result of the above-described occurrences, KNagy, JANagy, Relator and family has suffered physical pain, mental anguish, emotional distress, anxiety, embarrassment and humiliation and will continue to suffer the same for an indefinite period of time in the future, all to her great loss and detriment.

**Seventy-Nine.**  As a result of the above-described occurrences, KNagy and JANagy were unable to engage in the usual and customary domestic, vocational, social and recreational activities and other life's pleasures.

**Eighty.** The aforesaid acts of negligence, carelessness, gross negligence, recklessness, willful and knowing acts and/or failures of acts of Defendants, and/or its agents, workers, servants and/or employees, created a high degree of risk of harm to KNagy, JANagy, Relator and family which harm, in fact, did occur as set forth herein.

WHEREFORE, the Plaintiff, Joseph Eugene, house of Nagy, as Private Attorney General, respectfully requests that:

(a)   This Court award the Plaintiff, for the family, compensatory damages in an amount be proved at trial;

Complaint and Jury Demand

(b)   This Court award the Plaintiff, for the family, punitive damages for the Defendants' gross negligence, recklessness and/or willful and wanton conduct;

(c)   This Court award the Plaintiff reasonable attorney's fees and costs of suit;

and

(d)   This Court award such other and further relief as this Court deems is just and equitable.

## COUNT XII

### (as to ABC Corporations (1-5) and John Does (1-5))

**Eighty-One.** The Plaintiff incorporates by reference the allegations contained in paragraphs one through seventy-two, inclusive, as though same were set forth herein at length.

**Eighty-Two.** Plaintiff hereby pleads a Count against ABC Corporations (1-5) and John Does (1-5), fictitious individuals and/or business entities, pursuant to temporarily suffice for the presently unknown identities of other defendant parties who/which may have played any role whatsoever in contributing to the injuries and damages sustained by Plaintiffs more specifically described herein.

**Eighty-Three.** At such times as the identities of such fictitious pleaded defendants are ascertained, Plaintiff shall seek leave to amend the complaint

so as to substitute the actual names of said parties for the fictitious names set forth herein.

**Eighty-Four.** Plaintiff attributes each and every act of negligence and damages alleged against the named Defendants hereto to those who are fictitiously pleaded as if they were more specifically set forth in their entirety.

WHEREFORE, the Plaintiff, Joseph Eugene, house of Nagy respectfully requests that:

(a)  This Court award the Plaintiff compensatory damages in an amount be proved at trial;

(b)  This Court award the Plaintiff, for the family, punitive damages for the Defendants' gross negligence, recklessness and/or willful and wanton conduct;

(c)  This Court award the Plaintiff reasonable attorney's fees and costs of suit;

and

(d)  This Court award such other and further relief as this Court deems is just and equitable.

## XI. DEMAND FOR JURY TRIAL

Pursuant to F.R. Civ. P. 38(b), the Plaintiff hereby demands a trial by jury.

Joseph Eugene, house of Nagy
Non-Domestic Mail
c/o 508 Pennsylvania Avenue
Phillipsburg, New Jersey
ZIP Exempt

## AFFIDAVIT OF PROBABLE CAUSE

Relator now testifies that the evidentiary documents incorporated supra are true and correct, according to the best of His current information, knowledge and belief, and they do constitute probable cause to charge all of the above named and unnamed individuals with the corresponding criminal violations that are separately enumerated supra.

## VERIFICATION

I, Joseph Eugene, house of Nagy, Relator, Private Attorney General, sui juris, hereby verify, under penalty of perjury, under the laws of the United States of America, without the "United States" (federal government), that the above statement of facts and laws is true and correct, according to the best of my current information, knowledge, and belief, so help me God, pursuant to 28 U.S.C. § 1746(1). See the Supremacy Clause (Constitution), Laws like 28 U.S.C. § 1746, and Treaties are the supreme Law of the Land.

Dated: April ___19___, 2013 A.D.

Joseph Eugene, house of Nagy, Private Attorney General

Complaint and Jury Demand

## PROOF OF SERVICE

I, Joseph Eugene, house of Nagy, Private Attorney General, hereby certify under the laws of the United States of America, without the "United States" (federal government), that I am at least 18 years of age, an Inhabitant of the Land of New Jersey, ONE OF the United States of America, and that I personally served the following document:

## COMPLAINT AND JURY DEMAND:

Pursuant to 18 U.S.C. §§ 241, 1001, 1343, 1957 (RICO); 42 U.S.C. § 1988; FRCrP 3;  legal malpractice; misusing the legal system; third party beneficiary contract claims against attorneys; civil rights; property rights; upon receipt of the Summons, by placing one true and correct copy of said document in the United States Mail, Certified Mail with postage prepaid and properly addressed to the following defendants:

Mark Bertolini
Aetna, Inc.
Non-Domestic Mail
c/o 151 Farmington Avenue
Hartford, Connecticut
ZIP Exempt

Paul Ormond, CEO
HCR Manor Care, Inc.
Non Domestic mail
c/o 333 North Summit Street
Toledo, Ohio
ZIP Exempt

Archie Disidore
Northampton County
Non-Domestic Mail
c/o 669 Washington Street
Easton, Pennsylvania
ZIP Exempt

Rodney Myer
Kennedy, PC
Non-Domestic Mail
c/o 2000 Bustard Road, Suite 1
Cedars, Pennsylvanis
ZIP Exempt

Dated:    April  19 , 2013 A.D.

Joseph Eugene, house of Nagy, Private Attorney General